**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JON DARYL MYLES, | ) Case No. CV 13-3148-JPR |
| | ) |
| Plaintiff, | ) |
| | ) **MEMORANDUM OPINION AND ORDER** |
| vs. | ) **AFFIRMING COMMISSIONER** |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |
|   | ) |

**I.   PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying his application for supplemental security income ("SSI"). The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  This matter is before the Court on the parties' Joint Stipulation, filed February 27, 2014, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

1

## II.   BACKGROUND

Plaintiff was born on October 26, 1967.  (Administrative Record ("AR") 86.)  He completed 10th or 11th grade, in part through special-education coursework.  (See AR 166, 198, 207, 294, 296, 301.)  While in high school and for some time thereafter, he participated in a vocational training program, through which he was placed in warehouse jobs.  (AR 294, 300-01.) He did not keep any of those jobs for more than a few months and had not worked since either the late 1990s or early 2000s.  (AR 294, 296-97.)

On August 31, 2010, Plaintiff filed his fifth application for SSI, alleging that he had been unable to work since June 1, 1993, because of a right-hand deformity and illiteracy.  (See AR 11, 13, 86, 99, 105.)  After his application was denied initially and upon reconsideration, he requested a hearing before an ALJ. (AR 22-24.)  A video hearing was held on July 17, 2012, at which Plaintiff, who was represented by counsel, appeared and testified, as did a vocational expert ("VE").  (AR 291-309.)  In a written decision issued August 8, 2012, the ALJ determined that Plaintiff was not disabled.  (AR 11-18.)  Plaintiff requested Appeals Council review and submitted a letter challenging the ALJ's assessment of medical-opinion evidence concerning his physical and mental limitations.  (AR 288-90.)  On April 12, 2013, the Appeals Council denied his request for review.  (AR 3-5.)  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. Id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257

3

1  (9th Cir. 1992).

2      A.   The Five-Step Evaluation Process

3      The ALJ follows a five-step sequential evaluation process in

4  assessing whether a claimant is disabled.   20 C.F.R.

5  § 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir.

6  1995) (as amended Apr. 9, 1996).   In the first step, the

7  Commissioner must determine whether the claimant is currently

8  engaged in substantial gainful activity; if so, the claimant is

9  not disabled and the claim must be denied.   § 416.920(a)(4)(i).

10  If the claimant is not engaged in substantial gainful activity,

11  the second step requires the Commissioner to determine whether

12  the claimant has a "severe" impairment or combination of

13  impairments significantly limiting his ability to do basic work

14  activities; if not, a finding of not disabled is made and the

15  claim must be denied.   § 416.920(a)(4)(ii).   If the claimant has

16  a "severe" impairment or combination of impairments, the third

17  step requires the Commissioner to determine whether the

18  impairment or combination of impairments meets or equals an

19  impairment in the Listing of Impairments ("Listing") set forth at

20  20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is

21  conclusively presumed and benefits are awarded.

22  § 416.920(a)(4)(iii).

23      If the claimant's impairment or combination of impairments

24  does not meet or equal an impairment in the Listing, the fourth

25  step requires the Commissioner to determine whether the claimant

26

27

28

4

has sufficient residual functional capacity ("RFC")[1] to perform his past work; if so, the claimant is not disabled and the claim must be denied.  § 416.920(a)(4)(iv).  The claimant has the burden of proving he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.  If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. § 416.920(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis.  § 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

     B.   The ALJ's Application of the Five-Step Process

     Plaintiff's four prior applications for SSI were denied without appeal, and the ALJ, finding "no good cause to reopen any of those applications," deemed them "final and res judicata." (AR 13.)[2]

     At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since the date of his

---

     [1]   RFC is what a claimant can do despite existing exertional and nonexertional limitations.  § 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

     [2]   Thus, although Plaintiff alleged an onset date of June 1, 1993, the earliest possible onset date for his present application was the day after the denial of his most recent prior application, or January 1, 2009.  (AR 13.)  The ALJ instead used the application date, as recommended in Plaintiff's disability report (AR 144), and Plaintiff does not challenge that portion of the decision.

5

1   application, August 31, 2010.  (AR 13.)  At step two, he

2   concluded that Plaintiff had severe impairments of right-hand

3   congenital deformity and borderline intellectual functioning.[3]

4   (Id.)  At step three, the ALJ determined that Plaintiff's

5   impairments did not meet or equal a Listing.  (Id.)  At step

6   four, he determined that Plaintiff retained the RFC to perform

7   "medium work,"[4] except that he was limited to only occasional

8   fine manipulation with his right hand and simple, repetitive

9   tasks.  (AR 15.)  The ALJ found that Plaintiff had no past

10  relevant work.  (AR 17.)  At step five, the ALJ determined that

11  Plaintiff could perform jobs existing in significant numbers in

12  the national economy.  (Id.)  He therefore found that Plaintiff

13  was not disabled.  (AR 17-18.)

14  **V.   DISCUSSION**

15      Plaintiff contends that the ALJ erred in evaluating the

16  medical-opinion evidence concerning Plaintiff's physical and

17  mental impairments, assessing Plaintiff's credibility,

18  and relying on the testimony of the VE.

19

20

21

22

23      [3]    "Borderline intellectual functioning" indicates that a
    person has below-average cognitive ability, that is, an IQ of 71
24  to 84, but the deficit is not as severe as "mental retardation"
    (now referred to as "intellectual disability"), which is defined
25  as having an IQ of 70 or below.  See Diagnostic and Statistical
    Manual of Mental Disorders 740 (revised 4th ed. 2000); Diagnostic
26  and Statistical Manual of Mental Disorders 33 (5th ed. 2013).

27      [4]    "Medium work" involves "lifting no more than 50 pounds
    at a time with frequent lifting or carrying of objects weighing
28  up to 25 pounds."  § 416.967(c).

A.   <u>Plaintiff's Claims Are Barred by Res Judicata</u>

As an initial matter, because Plaintiff was found to be not disabled in prior administrative proceedings, he faced a presumption of continuing nondisability and was required to demonstrate "changed circumstances" since the prior ruling to overcome that presumption.  See <u>Chavez v. Bowen</u>, 844 F.2d 691, 693 (9th Cir. 1988).  For instance, a claimant can demonstrate a "changed circumstance" by showing a change in his age category under section 416.963, an increase in the severity of his impairments, the alleged existence of impairments not considered in the prior adjudication, or a change in the criteria for determining disability.  <u>See</u> 62 Fed. Reg. 64038-01 (Dec. 3, 1997).  Plaintiff, however, has shown none of these.  Rather, he remained a younger person (<u>see</u> § 416.963(c)), he alleged the same impairments and resulting limitations, and the regulatory criteria remained unchanged.  (<u>Compare</u> AR 157 (2006 complaint of right-hand deformity) <u>and</u> AR 165 (2006 complaints of right-hand deformity and illiteracy) <u>and</u> AR 177 (2007 complaint of right-hand deformity) <u>with</u> AR 184 (2011 complaint of right-hand deformity) <u>and</u> AR 206 (2011 complaint of illiteracy).)  Indeed, Plaintiff's middle-finger deformity is a congenital condition that has apparently not changed since birth.  (<u>See, e.g.</u>, AR 157, 169, 184.)

Accordingly, his claims are subject to res judicata under <u>Chavez</u>.  844 F.2d at 693; <u>cf.</u> <u>Thornsberry v. Colvin</u>, 552 F. App'x 691, 692 (9th Cir. 2014) (ALJ properly applied res judicata to claimant's application when she did not present any evidence to suggest that her condition had deteriorated or that circumstances

7

1  changed after initial denial of benefits).  Because the ALJ chose

2  to consider additional medical evidence, however, the Court

3  addresses Plaintiff's challenges to the ALJ's interpretation of

4  that evidence.  See Stubbs-Danielson v. Astrue, 539 F.3d 1169,

5  1173 (9th Cir. 2008); Alekseyevets v. Colvin, 524 F. App'x 341,

6  344 (9th Cir. 2013) ("Although the first ALJ's RFC findings are

7  entitled to 'some res judicata consideration,' the Chavez

8  presumption does not prohibit a subsequent ALJ from considering

9  new medical information and making an updated RFC determination."

10 (internal citation omitted)).

11      B.   The ALJ Did Not Err in Assessing the Medical-Opinion

12           Evidence

13      Plaintiff contends that the ALJ erred in assessing the

14 medical opinions of examining physicians Homayoun Saeid and Barry

15 Gwartz and state-agency physician Lucy Sauer concerning the

16 limitations imposed by Plaintiff's right-hand deformity.  (See J.

17 Stip. at 4-5.)  He further contends that the ALJ erred in

18 discounting the opinion of examining psychologist Heike

19 Ballmeier.  (Id. at 9.)

20      1.   Applicable law

21      Three types of physicians may offer opinions in Social

22 Security cases: "(1) those who treat[ed] the claimant (treating

23 physicians); (2) those who examine[d] but d[id] not treat the

24 claimant (examining physicians); and (3) those who neither

25 examine[d] nor treat[ed] the claimant (non-examining

26 physicians)."  Lester, 81 F.3d at 830.  A treating physician's

27 opinion is generally entitled to more weight than the opinion of

28 a doctor who examined but did not treat the claimant, and an

8

1    examining physician's opinion is generally entitled to more
2    weight than that of a nonexamining physician.  Id.  The weight
3    given a medical opinion is determined by length of the treatment
4    relationship, frequency of examination, nature and extent of the
5    treatment relationship, amount of evidence supporting the
6    opinion, consistency with the record as a whole, the doctor's
7    area of specialization, and other factors.  § 416.927(c)(2)-(6).

8         When an examining doctor's opinion is not contradicted by
9    some evidence in the record, it may be rejected only for "clear
10   and convincing" reasons.  See Carmickle v. Comm'r, Soc. Sec.
11   Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting Lester, 81
12   F.3d at 830-31).  When an examining physician's opinion is
13   contradicted, the ALJ must provide only "specific and legitimate
14   reasons" for discounting it.  Id.  The ALJ need not, however,
15   accept the opinion of any physician "if that opinion is brief,
16   conclusory, and inadequately supported by clinical findings."
17   Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2001); accord
18   Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th
19   Cir. 2004).

20            2.   Medical-opinion evidence concerning Plaintiff's
21                 finger deformity

22        Plaintiff has apparently never sought treatment for his
23   finger deformity, so the record contains no medical opinions from
24   treating doctors.

25        On November 8, 2006, Dr. Gwartz completed an internal-
26   medicine evaluation of Plaintiff.  Plaintiff reported that in his
27   1990 warehouse job, he was "able to buck various shipments
28   without difficulty" (AR 165), but he demonstrated right-hand grip

strength of only 10 pounds versus left-hand grip strength of 60 pounds (AR 167).  Dr. Gwartz noted that although Plaintiff's right-hand muscles appeared intact, his deformed right middle finger was tender and his right-hand grip strength was limited by his inability to flex the finger.  (AR 168.)  Dr. Gwartz found Plaintiff to be otherwise normal physically (AR 169) and opined that Plaintiff was capable of medium work but was "unable to perform fine manipulation with the right hand" (AR 170).

On January 26, 2011, Dr. Saeid performed an internal-medicine evaluation of Plaintiff.  Plaintiff did not disclose his warehouse work and asserted that the "most that he can lift and carry is one pencil."  (See AR 184-85.)  Dr. Saeid found Plaintiff to be physically normal except for his right finger, whose deformity limited Plaintiff's right-hand strength to four out of five on a squeeze test.  (AR 187.)  Dr. Saeid opined that Plaintiff was capable of medium work but only "occasional fine and gross manipulative functions with the right hand and fingers."  (AR 188.)

On March 21, 2011, Dr. Sauer reviewed Dr. Saeid's examination report and Plaintiff's incomplete written submissions and opined that he was capable of light work but only occasional fine manipulation with his right hand.  (AR 242, 246.)  Her findings were affirmed by Dr. F. Wilson upon review of the medical evidence.  (AR 248, 250.)

Plaintiff contends that the ALJ failed to give specific and legitimate reasons for excluding from the RFC certain limitations recommended by Drs. Saeid, Gwartz, and Sauer.  (See J. Stip. at 4-5.)  Plaintiff notes that the RFC provides for "medium work"

but only "occasional fine manipulation with the right hand" (AR 15) and thus excludes Dr. Saeid's restriction to only "occasional gross manipulative functions" (AR 188), Dr. Gwartz's complete exclusion of "fine manipulation" (AR 170), and Dr. Sauer's limitation to "light" work (AR 246).

Contrary to Plaintiff's contention, the ALJ gave specific and legitimate reasons for weighing the doctors' opinions as he did. First, he noted that Drs. Saeid and Gwartz examined Plaintiff and their opinions were not contradicted by any treating source. (AR 14.) As examining physicians in a record devoid of evidence from treating doctors, Drs. Saeid and Gwartz provided not only substantial evidence upon which the ALJ could rely but presumptively controlling opinion evidence. See § 416.927(c)(1), (e); Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) ("[G]reater weight is accorded to the opinion of an examining physician than a non-examining physician."); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (holding examining physician's opinion "alone constitutes substantial evidence, because it rests on his own independent examination of [claimant]"). The ALJ thus reasonably adopted the examining doctors' mutually held opinion that Plaintiff could perform medium work over the light-work restriction recommended by Dr. Sauer, who had no opportunity to examine Plaintiff.

Second, the ALJ noted that Plaintiff's failure to disclose to Dr. Saeid his past jobs as a warehouse worker not only undermined Plaintiff's credibility (see infra Section V.C) but also might "have affected Dr. Saeid's opinion." (AR 16.) Indeed, Plaintiff not only failed to disclose his previous work

but reported to Dr. Saeid that "he has difficulty . . . lifting and carrying . . . heavy objects." (AR 184.) Yet when examined by Dr. Gwartz, Plaintiff confirmed that "he was able to buck various shipments without difficulty" when employed as a warehouse laborer. (AR 165.) This discrepancy in Plaintiff's reports to his examining doctors may well account for Dr. Saeid's limitation to only occasional gross manipulation, a restriction contradicted not only by Dr. Gwartz but also by Plaintiff's ability to heft large shipments and operate a car. (See AR 16.) Because the ALJ legitimately – and specifically – surmised that Dr. Saeid's limitation on gross manipulation may have been based on statements that were not credible as well as on material omissions, the ALJ properly excluded that restriction from Plaintiff's RFC. See Andrews, 53 F.3d at 1040 (noting that "an ALJ may properly consider a claimant's lack of credibility and the extent to which his physician's opinion is influenced by the claimant's own information"); Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (finding ALJ's rejection of physician's opinion legitimate when dependent on clamant's properly discredited statements).

        It is solely the ALJ's duty to resolve conflicts in medical-opinion evidence. See Andrews, 53 F.3d at 1041. Here, the RFC is largely consistent with the opinions of Drs. Saeid, Gwartz, and Sauer, which overlap significantly and which the ALJ expressly "acknowledged." (AR 14.) The RFC not only reflects the examining physicians' finding of medium-work capacity but also the mutual finding of Drs. Saeid and Sauer that Plaintiff can do occasional fine manipulation with his right hand and the

1  agreement of Drs. Gwartz and Sauer that Plaintiff can do
2  unlimited gross manipulation with that hand.[5]  Where, as here,
3  the ALJ's findings are supported by substantial evidence, this
4  Court may not engage in second-guessing.  See Thomas, 278 F.3d at
5  959; Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989).

6        Moreover, even if the ALJ had incorporated the most
7  restrictive of the doctors' limitations into the RFC, it would
8  not likely have altered the ultimate disability determination.
9  The medical opinions concerning Plaintiff's right hand varied
10  little, and none of the doctors opined that Plaintiff's finger
11  deformity rendered him unable to work.  As discussed infra, the
12  ALJ propounded four hypotheticals to the VE, altering the
13  restrictions in each according to the slight variations in the
14  opinions of Drs. Saeid, Gwartz, and Sauer.  (See Section V.D.)
15  In each case, the VE identified available jobs that the
16  hypothetical individual could perform.  Thus, Plaintiff has not
17  shown that any error prejudiced him.  See Molina v. Astrue, 674
18  F.3d 1104, 1111 (9th Cir. 2012) (party attacking determination
19  normally carries burden of showing error harmful).

20              3.  Medical-opinion evidence concerning Plaintiff's
21                  mental impairment

22        On November 7, 2006, psychologist Mark Pierce completed a
23  psychological evaluation of Plaintiff.  Dr. Pierce reported that
24  Plaintiff "under-perform[ed] with all administered testing,"
25  including a test for malingering.  (AR 159.)  Dr. Pierce noted
26
   _____
27        [5]   As the Commissioner notes (J. Stip. at 6 n.1), Dr.
   Ballmeier also found that Plaintiff appeared to have "no gross
28  motor limitations" (AR 200).

                              13

1  that Plaintiff obtained a verbal IQ score of 61, a performance IQ
2  score of 59, and a full-scale IQ score of 56, but he cautioned
3  that Plaintiff's behavior at the examination indicated "stronger
4  cognitive ability."  (AR 160.)  Dr. Pierce's diagnoses included
5  malingering and "estimated" borderline intellectual functioning.
6  (AR 161.)  Dr. Pierce opined that Plaintiff might have
7  "difficulty working effectively with others" because of his
8  demonstrated lack of cooperation during the exam.  (AR 162.)  Dr.
9  Pierce added, however, that Plaintiff could "remember and comply
10  with simple one and two part instructions" and was "capable of
11  concentrating adequately for a regular work schedule for a full
12  workweek."  (Id.)

13      On December 5, 2007, Dr. Pierce again evaluated Plaintiff,
14  with similar findings.  Dr. Pierce noted Plaintiff's "under-
15  performance with most administered tests" and "significant
16  failure of a malingering-sensitive memory test."  (AR 179.)
17  Plaintiff obtained a verbal IQ score of 56, performance IQ score
18  of 51, and full-scale IQ score of 49, but Dr. Pierce again noted
19  "indications of stronger cognitive capability."  (AR 180.)  He
20  "estimated" that Plaintiff was a "[h]igher functioning mildly
21  developmentally delayed individual."  (AR 181; see AR 179.)  Dr.
22  Pierce again opined that Plaintiff might have difficulty working
23  with others but could manage simple instructions and concentrate
24  adequately during a regular work schedule.  (AR 181.)

25      On January 11, 2011, Dr. Ballmeier performed a psychological
26  evaluation in connection with Plaintiff's application for
27
28

14

services from the North Los Angeles County Regional Center.[6]  Dr. Ballmeier found that Plaintiff was not easily distracted but had "difficulty processing formal instructions."  (AR 198.) Plaintiff "articulated clearly," demonstrated "appropriate" "thought content" and "intact" "basic judgment," and showed no "disordered thinking."  (Id.)  Dr. Ballmeier opined that Plaintiff's testing efforts were sufficient to establish valid test scores.  (Id.)  Plaintiff was unable to complete some of the tests administered, consistently scored in the "extremely low range," and showed "mild deficit" on those tests he finished. (AR 198-200 (noting scores of 56, 58, and 50 on completed tests).)  Dr. Ballmeier diagnosed borderline intellectual functioning and opined that Plaintiff would need help finding work opportunities and might do best in a "workshop-type facility" akin to the vocational program he was previously enrolled in.  (AR 201.)

On November 12, 2011, Dr. Ballmeier completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental), in which he indicated that Plaintiff suffered marked restrictions in his ability to understand, remember, and carry out instructions and extreme limitations in his ability to make judgments on simple, work-related decisions, interact appropriately with others, and respond to work pressures and

_____

[6]   The Regional Center "is one of 21 private, non-profit organizations under contract with the California Department of Developmental Services (DDS) to coordinate and provide community-based services to persons with developmental disabilities."  North Los Angeles County Regional Center, http://www.nlacrc.org/index.aspx?page=2 (last visited June 23, 2014).

changes in work environment.  (AR 284-85.)  Dr. Ballmeier cited his January 2011 evaluation in support of this opinion, emphasizing Plaintiff's "cognitive skills . . . in the mild deficit range," illiteracy, and inability to do simple math.  (AR 285.)

On February 26, 2011, Dr. Stephan Simonian performed a complete psychiatric evaluation of Plaintiff.  (AR 206.)  Dr. Simonian found Plaintiff to have normal speech, coherent thought processes, appropriate affect, and "intact and average" intellectual functioning, memory, comprehension, and abstract thinking.  (AR 208-09.)  Plaintiff demonstrated "poor" capability with calculations, but Dr. Simonian attributed this to a lack of effort.  (AR 209.)  Dr. Simonian diagnosed adjustment disorder and "[l]earning disability by history."  (Id.)  He opined that Plaintiff suffered moderate limitations in his ability to maintain concentration and adapt to workplace stresses.  (AR 209-10.)  Plaintiff demonstrated no limitations in his ability to manage simple or complex instructions, interact with others, maintain attendance and perform work activities consistently, or work without supervision.  (Id.)

On March 16, 2011, state-agency psychologist Jon Etienne Mourot opined that the record showed "Developmental Delay, mild, higher functioning," mood disorder not otherwise specified, and adjustment disorder with mixed emotional features.  (AR 212, 214.)  Dr. Mourot assessed only mild and moderate functional limitations.  (AR 221.)  On June 9, 2011, state-agency psychiatrist Dr. Samuel Gold assessed borderline intellectual functioning but noted that there were no valid IQ scores in

16

Plaintiff's file.  (AR 261.)  Dr. Gold found only mild functional
limitations.  (AR 268.)

     Although Plaintiff contends that the ALJ "rejected" Dr.
Ballmeier's opinion (J. Stip. at 10), the ALJ in fact explicitly
accepted his diagnosis of borderline intellectual functioning
"despite credibility issues" (AR 15; see infra Section V.C).  The
ALJ thus found that Plaintiff should be "limited to simple,
repetitive tasks."  (AR 15.)

     Relatedly, Plaintiff objects to the ALJ's refusal to accept
his IQ scores as valid.  (J. Stip. at 11 (citing AR 16).)  Given
that Plaintiff's malingering interfered with Dr. Pierce's two
efforts to test his IQ, Plaintiff failed to complete IQ testing
with Dr. Ballmeier, and Dr. Ballmeier did not conduct any test
for malingering, the ALJ reasonably questioned the validity of
Plaintiff's IQ-test results.  (AR 16); cf. Clay v. Barnhart, 417
F.3d 922, 929 (8th Cir. 2005) (holding that ALJ may disregard low
IQ score when evidence shows substantial malingering); Soto v.
Secretary, 795 F.2d 219, 222 (1st Cir. 1986) (holding that ALJ
need not accept IQ score if substantial basis existed for
believing that plaintiff feigned results).  Indeed, not only were
both doctors forced to estimate Plaintiff's actual results (see
AR 161, 181, 199), but both diagnosed him with borderline
intellectual capacity rather than the "mental retardation" his
scores would seem to suggest (compare AR 160 (IQ scores of 61,
59, and 56) and AR 180 (IQ scores of 56, 51, and 49) and AR 198
(IQ scores of 56, 58, and 50) with supra n.3 ("borderline
intellectual capacity" describes IQ between 71 and 85)).  In any
event, because the ALJ accepted Dr. Ballmeier's diagnosis of

1  borderline intellectual functioning and incorporated it into

2  Plaintiff's RFC, any error in rejecting the IQ scores was

3  harmless.  See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050,

4  1055 (9th Cir. 2006) (finding error harmless when "the mistake

5  was nonprejudicial to the claimant or irrelevant to the ALJ's

6  ultimate disability conclusion").

7       The ALJ rejected Dr. Ballmeier's specific findings of marked

8  and extreme limitations because "he stated no basis for such

9  severe limitations" (AR 15), which is a specific and legitimate

10 basis upon which to reject a medical opinion.  See

11 § 416.927(c)(3); Thomas, 278 F.3d at 957; Batson, 359 F.3d at

12 1195.  Dr. Ballmeier cited his January 2011 examination of

13 Plaintiff in support of his later report of marked and extreme

14 limitations, but his findings upon examination were not so

15 severe.  For instance, although he found upon examination that

16 Plaintiff was not easily distracted but appeared to have

17 difficulty with "formal instructions" (AR 198), Dr. Ballmeier

18 indicated in his later assessment that Plaintiff would have

19 marked difficulty with even short, simple instructions (AR 284).

20 Similarly, Dr. Ballmeier noted in his report that Plaintiff

21 "articulated clearly," demonstrated "appropriate" "thought

22 content" and "intact" "basic judgment," and showed no "disordered

23 thinking" (AR 198), but he later indicated that Plaintiff's

24 ability to make work-related decisions was extremely limited (AR

25 284).  Although he purported to rely on his earlier examination,

26 Dr. Ballmeier's finding of "cognitive, functional academic, and

27 general adaptive skills . . . in the mild deficit range" (AR 201)

28 did not support his later opinion that Plaintiff suffered marked

18

and extreme functional limitations.[7]  Cf. Tommasetti, 533 F.3d at 1041 (finding that "incongruity" between doctor's questionnaire responses and her medical records provided specific and legitimate reason for rejecting her opinion of claimant's limitations).  Nothing in the record indicates that Plaintiff suffered any kind of worsening of his mental state in the relatively short span between Dr. Ballmeier's initial assessment and his later opinion.  Indeed, Dr. Ballmeier apparently had no contact with Plaintiff during that time.  (See, e.g., AR 300 (Plaintiff testifying that he had not had any contact with Dr. Ballmeier other than "testing").)

Notably, although Dr. Pierce also "estimated" a diagnosis of borderline intellectual functioning following his first examination of Plaintiff (AR 161), he opined that Plaintiff was capable of a job requiring simple one- and two-step instructions (AR 162).  Dr. Pierce confirmed that finding on his second examination of Plaintiff.  (AR 181.)  And his opinion was consistent with those of Dr. Simonian, who performed the most recent complete evaluation, in February 2011 (AR 209 (noting no significant limits with respect to simple or complex instructions)), and the state-agency physicians, who reviewed Plaintiff's file (AR 225 (noting no significant limits with respect to short, simple instructions); AR 261, 270 (noting borderline intellectual function and opining Plaintiff capable of simple, repetitive tasks)).  Moreover, as the ALJ noted, at the

---

[7]     As noted above, although Dr. Ballmeier reported that Plaintiff's scores were "extremely low" in much of the January 2011 testing, the doctor found only "mild deficits" in Plaintiff's functioning.  (See AR 198-200.)

19

time of the hearing, Plaintiff had again enrolled at the Regional
Center through which he obtained warehouse work after high school
(AR 15, 287, 294), in which, he testified, he was being provided
vocational and other training (AR 299).  Thus, aside from Dr.
Ballmeier's November 2011 opinion, the record consistently
suggested that Plaintiff was capable of work despite his mental
impairments.

    The ALJ also noted that Dr. Ballmeier was not a treating
doctor.  (AR 15.)  This is not itself a basis upon which to
reject his opinion, <u>see</u> § 416.927(c)(1), particularly given Dr.
Ballmeier's opportunity to examine Plaintiff, <u>Tonapetyan</u>, 242
F.3d at 1149.  Because Dr. Ballmeier is one of three examining
mental-health practitioners, however, and did not have any
greater or additional opportunity to examine Plaintiff than the
others, his November 2011 opinion was not only unsupported by his
own findings but an outlier among presumptively equally weighted
medical opinions.  It was the ALJ's duty to resolve the conflict
among the medical opinions, and because he gave a specific,
legitimate reason for discounting Dr. Ballmeier's extreme
findings, any error was harmless.  <u>Cf.</u> <u>Harlow v. Soc. Sec.</u>
<u>Admin., Comm'r</u>, 12-36011, 2014 WL 2505173, at *1 (9th Cir. June
4, 2014) (reliance on erroneous basis for discounting medical
opinion harmless when ALJ provided independent specific and
legitimate reason for doing so).

C.  <u>Any Error in Evaluating Plaintiff's Credibility Was</u>
    <u>Harmless</u>

Plaintiff contends that the ALJ erred in rejecting
Plaintiff's assertions regarding his subjective symptoms and
functional limitations.[8]  (J. Stip. at 17.)

1.  <u>Applicable law</u>

An ALJ's assessment of pain severity and claimant
credibility is entitled to "great weight."  <u>See</u> <u>Weetman v.</u>
<u>Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989); <u>Nyman v. Heckler</u>, 779
F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to
believe every allegation of disabling pain, or else disability
benefits would be available for the asking, a result plainly
contrary to 42 U.S.C. § 423(d)(5)(A)."  <u>Molina</u>, 674 F.3d at 1112
(internal quotation marks omitted).

In evaluating a claimant's subjective symptom testimony, the
ALJ engages in a two-step analysis.  <u>See</u> <u>Lingenfelter</u>, 504 F.3d
at 1035-36.  "First, the ALJ must determine whether the claimant
has presented objective medical evidence of an underlying
impairment [that] could reasonably be expected to produce the
pain or other symptoms alleged."  <u>Id.</u> at 1036 (internal quotation
marks omitted).  If such objective medical evidence exists, the
ALJ may not reject a claimant's testimony "simply because there
is no showing that the impairment can reasonably produce the
*degree* of symptom alleged."  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1290
(9th Cir. 1996) (emphasis in original).  When the ALJ finds a
claimant's subjective complaints not credible, the ALJ must make

--------

[8]   Plaintiff did not challenge the ALJ's credibility
finding in his letter to the Appeals Council.  (AR 288-90.)

1  specific findings that support the conclusion.  See Berry v.

2  Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).

3      Absent affirmative evidence of malingering, those findings

4  must provide "clear and convincing" reasons for rejecting the

5  claimant's testimony.  Lester, 81 F.3d at 834.  If the ALJ's

6  credibility finding is supported by substantial evidence in the

7  record, the reviewing court "may not engage in second-guessing."

8  Thomas, 278 F.3d at 959.

9          2.  Analysis

10      Plaintiff's contention that his performance on tests for

11  determining malingering was not a valid basis upon which to

12  discount his credibility (J. Stip. at 18) is inaccurate.  The law

13  is clear that an ALJ may rely on affirmative evidence of a

14  Plaintiff's malingering to discount his credibility; indeed, such

15  evidence relieves the ALJ of the burden of providing clear and

16  convincing reasons for discounting a plaintiff's credibility.

17  See Lester, 81 F.3d at 834; Baqoyan Sulakhyan v. Astrue, 456 F.

18  App'x 679, 682 (9th Cir. 2011).  Although Plaintiff contends that

19  under the Agency's Program Operations Manual System (POMS) DI

20  22510.007(D)(2), his performance on malingering tests should not

21  be considered, the POMS is an internal SSA document that "does

22  not have the force of law," Warre v. Comm'r of Soc. Sec. Admin.,

23  439 F.3d 1001, 1005 (9th Cir. 2006), and is not binding on the

24  ALJ, see Lockwood v. Comm'r Soc. Sec. Admin., 616 F.3d 1068, 1073

25  (9th Cir. 2010) ("POMS constitutes an agency interpretation that

26  does not impose judicially enforceable duties on either this

27  court or the ALJ.").  Moreover, the provision cited by Plaintiff

28  appears to have been withdrawn.  See Office of the Inspector

22

Gen., SSA, A-08-13-23094, <u>Congressional Response Report: the</u>
<u>Social Security Administration's Policy on Symptom Validity Tests</u>
<u>in Determining Disability Claims</u> 3-4 (Sept. 2013), <u>available at</u>
http://oig.ssa.gov/sites/default/files/audit/full/pdf/
A-08-13-23094.pdf.

In any event, the evidence of Plaintiff's malingering is not
limited to his results on two malingering tests.  Dr. Pierce
twice diagnosed malingering, in 2006 and 2007, based on his
complete psychological evaluations of Plaintiff.  (AR 159, 179.)
And Dr. Simonian similarly noted a lack of effort in testing,
attributing to that Plaintiff's only poor performance during his
examination.  (AR 209.)  Accordingly, the ALJ reasonably relied
on evidence of Plaintiff's malingering in discounting his
credibility.

In addition, and although Plaintiff's malingering eliminated
the need to do so, <u>Lester</u>, 81 F.3d at 834, the ALJ provided clear
and convincing reasons for not fully crediting Plaintiff's
allegations regarding his symptoms and limitations.

The ALJ noted Plaintiff's "inconsistencies," including his
"failure to honestly state" to Dr. Saeid that Plaintiff had
worked as a warehouse laborer, likely affecting the accuracy of
the doctor's assessment of Plaintiff's right-hand limitations.
(AR 16.)  Plaintiff objects that he was placed in warehouse-
laborer positions solely as part of the vocational program in
which he was enrolled (J. Stip. at 17), but that has no bearing
on whether Plaintiff could complete the work, nor does it explain
why he did not disclose those positions in response to Dr.
Saeid's inquiry about whether Plaintiff had "worked for gainful

purposes outside of home" (AR 185).  Indeed, Plaintiff identified

his warehouse work in response to similar inquiries, suggesting

that his failure to mention it to Dr. Saeid was not a product of

mere misunderstanding or oversight.  (See AR 139 (noting on

disability report that Plaintiff had worked through vocational

program); AR 157 (disclosing to Dr. Pierce past jobs, noting that

they were "school-connected and supported"); AR 165 (Dr. Gwartz

noting Plaintiff "rarely employed during his adult life,"

"usually in a warehouse"); AR 198 (Dr. Ballmeier noting

Plaintiff's participation in "paid workshop program"); AR 207

(Dr. Simonian noting that Plaintiff "worked in a warehouse" until

2001); AR 296-97 (Plaintiff testifying to "warehouse job"

obtained "through the workshop").)  The ALJ properly considered

Plaintiff's lack of candor with Dr. Saeid in discounting his

credibility.  See Tommasetti, 533 F.3d at 1039 (noting that "many

factors" ALJ may consider in weighing claimant's credibility

include "ordinary techniques of credibility evaluation, such as

the claimant's reputation for lying, prior inconsistent

statements concerning the symptoms, and other testimony by the

claimant that appears less than candid" (internal quotation marks

omitted)).

     The ALJ also noted Plaintiff's possession of a driver's

license, indicating "the use of both hands."[9]  (AR 16.)

Plaintiff emphasizes his testimony that he obtained his driver's

license "a long time ago," when "right out of school," and had

---

[9]     Although the ALJ referred to a "valid" driver's
license, it is unclear from Plaintiff's testimony whether his
license remained current.  (See AR 298-99.)

24

not driven since then.  (J. Stip. at 17 (citing AR 302).)  It is undisputed, however, that Plaintiff's finger had been deformed since he was a child (see, e.g., AR 157, 169, 184), and Plaintiff has submitted no evidence that his finger impairment had worsened since the unspecified time when he actively drove.  Although Plaintiff objects that the ALJ did not explain how the use of both hands for driving undermined Plaintiff's claimed "functional limitations on lifting, handling and fingering" (J. Stip. at 17), the ALJ reasonably determined that Plaintiff's ability to operate a motor vehicle contradicted his allegations that his right hand was useless for such activities.[10]  Tommasetti, 533 F.3d at 1039; Molina, 674 F.3d at 1112 (noting that ALJ may consider "inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct" in assessing credibility).[11]

---

[10]  Similarly, Plaintiff has not explained how his alleged inability to read road signs (see AR 99), which did not prevent him from obtaining a license and driving, later prevented him from operating a car.

[11]  The record reflects other inconsistencies in Plaintiff's statements, although the ALJ did not expressly rely on them.  For instance, Plaintiff reported to Dr. Pierce in 2007 that he had two children (AR 178 (December 2007, two children, ages 9 and 12)) but reported elsewhere that he had only one (see AR 158, 198, 206, 303; see also AR 158 (November 2006, no children)).  And although Plaintiff otherwise reported that he wrote with his impaired right hand (see AR 157-58, 184) and likely had to write to complete high-school coursework, he claimed in his 2007 examination that "he cannot hold a pencil to write" (AR 177).  As Dr. Pierce noted, Plaintiff's failure to seek treatment for his deformed finger or to learn to use his left hand for writing suggests that his right-hand impairment was not as limiting as alleged.  (AR 158; see also AR 198 (Dr. Ballmeier noting lack of treatment)); cf. Molina, 674 F.3d at 1112 (ALJ may consider "unexplained or inadequately explained

1   The ALJ also found Plaintiff's regular activities of daily
2   living to be inconsistent with his allegations of disabling
3   impairments. (AR 16.)  Although Plaintiff testified that he did
4   some chores in the home he shared with his mother (see AR 297),
5   that did not support the ALJ's finding that Plaintiff helped care
6   for her (AR 16), as Plaintiff notes (J. Stip. at 18; see also AR
7   299.)  Moreover, given Plaintiff's limited other activities, the
8   ALJ's finding was probably erroneous. (See AR 253, 255-56, 261,
9   263); cf. Gallant v. Heckler, 753 F.2d 1450, 1455 (9th Cir. 1984)
10  (holding that ALJ erred in finding reading, watching television,
11  and socializing to be consistent with light level of exertion).
12  Any error was harmless, however, given the ALJ's identification
13  of other, valid grounds for discounting Plaintiff's credibility.
14  See Carmickle, 533 F.3d at 1162-63 (finding error harmless when
15  ALJ cited other reasons to support credibility determination).

16  On appellate review, this Court is limited to determining
17  whether the ALJ properly identified reasons for discrediting
18  Plaintiff's credibility. Smolen, 80 F.3d at 1284.  Plaintiff's
19  malingering and inconsistent statements were proper and
20  sufficiently specific bases for discounting his claims of
21  disabling symptoms, and the ALJ's reasoning was in any event
22  clear and convincing.  See Tommasetti, 533 F.3d at 1039-40;
23  Houghton v. Comm'r Soc. Sec. Admin., 493 F. App'x 843, 845 (9th
24  Cir. 2012).  Because the ALJ's findings were supported by
25  substantial evidence, this Court may not engage in
26  second-guessing.  See Thomas, 278 F.3d at 959; Fair, 885 F.2d at
27
28  failure to seek treatment").

604.  Remand is not warranted.

D.   <u>The ALJ Was Entitled to Rely on the VE's Testimony</u>

Plaintiff contends without elaboration that the ALJ presented an incomplete hypothetical to the VE and that the VE's testimony therefore was not substantial evidence.[12]   (J. Stip. at 24 (citing AR 305).)

At step five, the Commissioner must show that the claimant can engage in substantial gainful activity other than his past work, a burden she can meet by propounding to a VE a hypothetical based on medical assumptions supported by substantial evidence in the record and reflecting all the claimant's limitations. <u>Magallanes v. Bowen</u>, 881 F.2d 747, 756 (9th Cir. 1989); <u>Roberts v. Shalala</u>, 66 F.3d 179, 184 (9th Cir. 1995).  If the ALJ's hypothetical "contain[s] all of the limitations that the ALJ found credible and supported by substantial evidence in the record," the ALJ may properly rely on the testimony the VE gives in response to the hypothetical in formulating an RFC assessment. <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1217 (9th Cir. 2005).  If, however, the hypothetical does not reflect all the claimant's limitations, "then the 'expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy.'"  <u>Matthews v. Shalala</u>, 10 F.3d 678, 681 (9th Cir. 1993) (quoting <u>DeLorme v. Sullivan</u>, 924 F.2d 841, 850 (9th Cir. 1991)).

Here, the ALJ proposed four hypothetical individuals to the VE: (1) an illiterate person capable of medium work but limited

_____

[12]   Plaintiff did not raise this issue in his letter to the Appeals Council.  (AR 288-90.)

to occasional fine manipulation with the right hand and simple,
repetitive tasks (AR 305); (2) an illiterate person capable of
light work but limited to occasional fine manipulation with the
right hand and simple, repetitive tasks (id.); (3) an illiterate
person capable of light work but limited to occasional handling
and fingering with the right hand and simple, repetitive tasks
(AR 306); and (4) an illiterate person capable of medium work but
limited to occasional handling and fingering with the right hand
and simple, repetitive tasks (AR 307).  The ALJ thus propounded
hypotheticals that assumed varying combinations of the
limitations identified by the medical sources with the exception
of those he had explicitly discounted.  The ALJ thereby satisfied
his obligation to present a complete hypothetical.  See Bayliss,
427 F.3d at 1217 (when hypothetical included "all of the
limitations that the ALJ found credible and supported by
substantial evidence in the record," reliance on VE's testimony
in response was proper); Magallanes, 881 F.2d at 756 ("The
limitation of evidence in a hypothetical question is
objectionable 'only if the assumed facts could not be supported
by the record.'" (quoting Sample v. Schweiker, 694 F.2d 639,
643-44 (9th Cir. 1983) (as long as hypothetical question posed by
ALJ is properly based on all relevant evidence, testimony of
vocational expert is valuable))).

     Moreover, in each instance, the VE testified that there were
jobs available regionally and nationally that the hypothetical
individual could perform.  (See AR 305-08.)  Although the VE
testified in response to questioning by Plaintiff's counsel that
the third hypothetical individual would be unable to do the

identified jobs of usher and crossing guard if "socially"
"limited" (AR 308), the sole medical source to suggest that
Plaintiff was so restricted was Dr. Ballmeier, whose extreme
findings the ALJ properly discounted as unsupported.  As such,
the ALJ was entitled to rely on the VE's responsive testimony as
substantial evidence.  See Bayliss, 427 F.3d at 1217; Rollins v.
Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (ALJ not required to
include rejected limitations).

    Reversal is not warranted on this basis.

**VI.  CONCLUSION**

    Consistent with the foregoing, and pursuant to sentence four
of 42 U.S.C. § 405(g),[13] IT IS ORDERED that judgment be entered
AFFIRMING the decision of the Commissioner and dismissing this
action with prejudice.  IT IS FURTHER ORDERED that the Clerk
serve copies of this Order and the Judgment on counsel for both
parties.

DATED: July 21, 2014     _____
                         JEAN ROSENBLUTH
                         U.S. Magistrate Judge

---

    [13]    This sentence provides: "The [district] court shall
have power to enter, upon the pleadings and transcript of the
record, a judgment affirming, modifying, or reversing the
decision of the Commissioner of Social Security, with or without
remanding the cause for a rehearing."